1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **SOUTHERN DISTRICT OF CALIFORNIA**

10   WESTERN LANDS PROJECT,              CASE NO. 13-cv-339 JM (JMA)
     DESERT PROTECTIVE COUNCIL,
11   AND WESTERN WATERSHEDS             ORDER FINDING PLAINTIFFS
     PROJECT,                          HAVE STANDING; DENYING
12                                     PLAINTIFFS' MOTION FOR
                                       SUMMARY JUDGMENT; AND
13                    Plaintiff,       GRANTING DEFENDANTS' CROSS-
                                       MOTION FOR SUMMARY
14   vs.                              JUDGMENT

15   UNITED STATES BUREAU OF
     LAND MANAGEMENT and SALLY
16   JEWELL, Secretary of the Interior,

17                    Defendant.

18
19          This case requires the court to decide whether the United States Bureau of

20   Land Management complied with the National Environmental Policy Act of 1969

21   ("NEPA"), 42 U.S.C. § 4321 *et seq.*, when it issued a programmatic environmental

22   impact statement for utility-scale solar energy projects.  Presently before the court is

23   a motion for summary judgment filed by Plaintiffs Western Lands Project ("WLP"),

24   Desert Protective Council ("DPC"), and Western Watersheds Project ("WWP")

25   (collectively, "Plaintiffs") on February 14, 2014.  (Dkt. No. 13).  Also before the

26   court is a cross-motion for summary judgment filed by Defendants United States

27   Bureau of Land Management ("BLM") and Sally Jewell, Secretary of the Interior,

28   on March 14, 2014.  (Dkt. No. 14).  Plaintiffs filed their response to Defendants'

     cross-motion for summary judgment on March 28, 2014, (Dkt. No. 15), and

1   Defendants filed their response to Plaintiffs' motion for summary judgment on

2   April 11, 2014, (Dkt. No. 17).  Having reviewed the parties' arguments, relevant

3   case law,  and applicable portions of the administrative record, and the parties not

4   having requested oral argument, the court finds this matter suitable for resolution on

5   the papers without oral argument pursuant to Civil Local Rule 7.1.d.1.  For the

6   reasons set forth below, the court finds Plaintiffs have standing, denies Plaintiffs'

7   motion for summary judgment, and grants Defendants' motion for summary

8   judgment.

9                                    **BACKGROUND**

10          On October 12, 2012, the BLM published the Approved Resource

11   Management Plan Amendments/Record of Decision for Solar Energy Development

12   in Six Southwestern States ("ROD").  (ROD, Administrative Record ("AR")

13   35:0028219).[1]  The ROD records the decision of the BLM Director, as approved by

14   the Secretary of the Interior, to establish a comprehensive Solar Energy Program for

15   the development of utility-scale solar energy resources on BLM-administered public

16   lands in six southwestern states: Arizona, California, Colorado, Nevada, New

17   Mexico, and Utah.[2]  (Id. at 0028228).  The ROD adopts the Preferred Alternative as

18   analyzed in the Final Programmatic Environmental Impact Statement for Solar

19   Energy Development in Six Southwestern States ("Solar PEIS"), prepared by the

20   BLM and the U.S. Department of Energy ("DOE").  (Id. at 0028226).

21          Prior to adoption of the ROD, the BLM's practice was to evaluate solar

22   energy right-of-way ("ROW") applications on a project-by-project basis.  (Final

23   PEIS Vol. 1, AR 27:0014254).  Because many of BLM's existing land use plans did

24

25      [1] The court adopts the parties' method for citing documents in the Administrative
    Record with the format: "AR xxxxx:yyyyyy-zz."  The "xxxxx" identifies the Record
26   Number; "yyyyyy" identifies the Bates number of the first page cited within that
    record; and "zz" identifies the Bates number of the last page cited.
27

28      [2] "Utility-scale facilities" are defined as "projects with capacities of 20
    megawatts (MW) or greater that generate electricity that is delivered into the electricity
    transmission grid."  (ROD, AR 35:0028226).

1   not specifically address solar energy development, solar energy projects that were

2   not in conformance with the existing land use plans required individual amendments

3   to the land use plans.  (Id.)  Nor did the BLM have a standard set of mitigation

4   measures that applied consistently to all solar energy development projects.  (Id.)

5   The Solar PEIS was created to evaluate a comprehensive Solar Energy Program that

6   would address these limitations.  (Id.)

7          In the Purpose and Need provision of the Solar PEIS, the BLM acknowledges

8   a "need to respond in a more efficient and effective manner to the high interest in

9   siting utility-scale solar energy development on public lands and to ensure

10  consistent application of measures to avoid, minimize, and mitigate the potential

11  adverse impacts of such development."  (Id.)  The Solar PEIS analyzes the

12  feasibility of the BLM "replacing certain elements of its existing solar energy

13  policies with a comprehensive Solar Energy Program that would allow the

14  permitting of future solar energy development projects to proceed in a more

15  efficient, standardized, and environmentally responsible manner."  (Id.)  In doing

16  so, the proposed Solar Energy Program will further the BLM's ability to meet the

17  mandates of Executive Order 13212[3] and the Energy Policy Act of 2005,[4] as well as

18  the requirements of Department of the Interior ("DOI") Secretarial Order 3285A1

19  directing DOI agencies to identify and prioritize specific locations best suited for

20

21

22

23

---

24  [3] Executive Order 13212 "Actions to Expedite Energy-Related Projects"
    mandates that federal agencies expedite their review of permits for energy-related
25  projects, or take other actions as necessary to accelerate the completion of such
    projects, in a manner consistent with applicable laws to increase the "production and
26  transmission of energy in a safe and environmentally sound manner."  66 Fed. Reg.
    28357 (May 18, 2001).

27  [4] The Energy Policy Act of 2005 sets forth the "sense of Congress" that the
    Secretary of the Interior should seek to have approved non-hydropower renewable
28  energy projects on the public lands with a generation capacity of at least 10,000 MW
    by 2015.  Pub. L. 109–58, § 211, 119 Stat. 594, 660 (2005).

large-scale solar energy development on public lands.[5]  (Id.)

In order to accomplish these goals, the Solar PEIS analyzed three alternatives for managing utility-scale solar energy development on BLM-administered lands in the six-state study area: (1) the Solar Energy Development Program Alternative - excludes categories of BLM lands from development entirely, identifies specific locations called Solar Energy Zones ("SEZs") that are well suited for development , and allows for the possibility of solar development in variance areas outside of the SEZs if done in accordance with the proposed variance process, (Final PEIS, AR 27:0014300-38, 0014474-83); (2) the Solar Energy Zone Program Alternative ("SEZ Alternative") - similar to the Solar Energy Development Program Alternative, but restricts development to the areas identified as SEZs without allowing for a variance process and thus treats all BLM lands outside of the SEZs as exclusion areas, (Id. at 0014338-39, 0014483-87); and (3) the No Action Alternative - allows the BLM to continue authorizing development on any BLM-administered lands by implementing the requirements of existing solar energy policies on a project-by-project basis, (Id. at 0014215, 0014242, 0014487-90).

In the Solar PEIS, the BLM determined that the first alternative, the Solar Energy Development Program alternative, was its preferred alternative ("Preferred Alternative").  The BLM concluded that the Preferred Alternative "would make an adequate amount of suitable lands available to support the level of development projected in the [reasonably foreseeable development scenario] and would provide flexibility in siting both solar energy facilities and associated transmission infrastructure." (Final PEIS Exec. Summ., AR 26:0014155).  In the ROD, the BLM

---

[5] DOI Secretarial Order 3285A1, dated March 11, 2009, and amended on February 22, 2010, "establishes the development of renewable energy as a priority" for the DOI and requires agencies and bureaus in the DOI to "work collaboratively with each other, and with other Federal agencies, departments, states, local communities, and private landowners to encourage the timely and responsible development of renewable energy and associated transmission while protecting and enhancing the Nation's water, wildlife. and other natural resources." (DOI Secretarial Order 3285A1 AR 4479:0242431-32).  It also directs agencies to "establish clear policy direction for authorizing the development of solar energy on public lands." (Id.)

1   also noted that both the Preferred Alternative and the SEZ Alternative would be

2   environmentally preferable over the No Action Alternative.  (ROD, AR

3   35:0028228).

4        In this action, Plaintiffs challenge the BLM's adoption of the analysis from

5   the Solar PEIS in the ROD on the ground the Solar PEIS failed to analyze

6   reasonable alternatives for the BLM's solar energy policy.  Specifically, Plaintiffs

7   argue the Solar PEIS should have given further consideration to two alternatives:

8   (1) limiting utility-scale solar development to degraded public lands, and (2)

9   smaller-scale distributed generation of solar power near urban areas.  Plaintiffs

10  contend the BLM's failure to adequately consider these options in the Solar PEIS

11  violates the Natural Environmental Policy Act ("NEPA"), which requires federal

12  agencies to consider reasonable alternatives when creating an environmental impact

13  statement like the Solar PEIS.  See 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.14.

14       In Defendants' cross-motion for summary judgment, Defendants contend that

15  Plaintiffs lack standing to challenge the sufficiency of the Solar PEIS.  Defendants

16  also argue that the Solar PEIS sufficiently considered reasonable alternatives and

17  therefore satisfies NEPA's requirements.

18                              **LEGAL STANDARDS**

19  **I. Summary Judgment Standard**

20       A motion for summary judgment shall be granted where "there is no genuine

21  issue as to any material fact and ... the moving party is entitled to judgment as a

22  matter of law."  Fed. R. Civ. P. 56(c); Prison Legal News v. Lehman, 397 F.3d 692,

23  698 (9th Cir. 2005).  The moving party bears the initial burden of informing the

24  court of the basis for its motion and identifying those portions of the file which it

25  believes demonstrates the absence of a genuine issue of material fact.  Celotex

26  Corp. v. Catrett, 477 U.S. 317, 323 (1986).  There is "no express or implied

27  requirement in Rule 56 that the moving party support its motion with affidavits or

28  other similar materials *negating* the opponent's claim."  Id. (emphasis in original).

1   The opposing party cannot rest on the mere allegations or denials of a pleading, but

2   must "go beyond the pleadings and by [the party's] own affidavits, or by the

3   'depositions, answers to interrogatories, and admissions on file' designate 'specific

4   facts showing that there is a genuine issue for trial.'" Id. at 324 (citations omitted).

5   The opposing party also may not rely solely on conclusory allegations unsupported

6   by factual data. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

7   **II. Standard of Review for NEPA Claims**

8       The parties seek summary judgment on Plaintiffs' NEPA claim. NEPA

9   provides "our basic national charter for protection of the environment." 40 C.F.R.

10  § 1500.1(a) (2006). The regulations implementing NEPA have developed

11  procedures to "insure that environmental information is available to public officials

12  and citizens before decisions are made and before actions are taken. The

13  information must be of high quality. Accurate scientific analysis, expert agency

14  comments, and public scrutiny are essential to implementing NEPA." Id.

15  § 1500.1(b).

16      Congress passed NEPA "to protect the environment by requiring that federal

17  agencies carefully weigh environmental considerations and consider potential

18  alternatives to the proposed action before the government launches any major

19  federal action." Lands Council v. Powell, 395 F.3d 1019, 1026 (9th Cir. 2005).

20  "NEPA requires that a federal agency consider every significant aspect of the

21  environmental impact of a proposed action ... [and] inform the public that it has

22  indeed considered environmental concerns in its decisionmaking process." Earth

23  Island Inst. v. U.S. Forest Serv., 351 F.3d 1291, 1300 (9th Cir. 2003) (internal

24  quotation marks and citations omitted). Under NEPA, all federal agencies,

25  including the Army, must prepare an environmental impact statement ("EIS") for all

26  "major Federal actions significantly affecting the quality of the human

27  environment." 42 U.S.C. § 4332(2)(C). That EIS "shall provide full and fair

28  discussion of significant environmental impacts and shall inform decisionmakers

and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1.

In general, judicial review of actions brought under NEPA is governed by the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 551-559, 701-706.  The APA provides that any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" is prohibited and shall be overturned by the court.  5 U.S.C. § 706(2)(A); California v. Norton, 311 F.3d 1162, 1170 (9th Cir. 2002).  "NEPA does not mandate particular substantive results, but instead imposes only procedural requirements."  Laguna Greenbelt, Inc. v. U.S. Dept. of Transp., 42 F.3d 517, 523 (9th Cir. 1994).  Under this standard, the "court is not to substitute its judgment for that of the agency."  Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  Nevertheless, "the agency must examine the relevant data and articulate a satisfactory explanation" for its decision and, in reviewing that explanation, the court must consider whether the decision was based on a consideration of the relevant factors and whether there was a clear error in judgment.  Id.  This inquiry must "be searching and careful," but "the ultimate standard of review is a narrow one."  Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971); Natural Resources Defense Council, Inc. v. Hodel, 819 F.2d 927, 929 (9th Cir. 1987) (the court applies deferential standard of review to Environmental Impact Statements).

> When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive. On the other hand, in the context of reviewing a decision not to supplement an EIS, courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information. A contrary approach would not simply render judicial review generally meaningless, but would be contrary to the demand that courts ensure that agency decisions are founded on a reasoned evaluation 'of the relevant factors.'

1  Marsh v. Or. Natural Resources Council, 490 U.S. 360, 378 (1989).

2         "The standard is 'highly deferential, presuming agency action to be valid and

3  affirming the agency action if a reasonable basis exists for its decision.'" Protect

4  Our Cmtys. Found. v. Salazar, No. 12-cv-2211 GPC (PCL), 2013 WL 5947137, at

5  *2 (S.D. Cal. Nov. 6, 2013) (quoting Nw. Ecosystem Alliance v. U.S. Fish and

6  Wildlife Serv., 475 F.3d 1136, 1140 (9th Cir. 2007)).  Agency action is valid if the

7  agency "'considered the relevant factors and articulated a rational connection

8  between the facts found and the choices made.'" Id. (quoting Arrington v. Daniels,

9  516 F.3d 1106, 1112 (9th Cir. 2008)).

10         In considering a NEPA challenge, the court "may not substitute its judgment

11  for that of the agency concerning the wisdom or prudence of a proposed action."

12  Laguna Greenbelt, 42 F.3d at 523 (quoting Or. Envtl. Council v. Kunzman, 817

13  F.2d 484, 492 (9th Cir. 1987)).  NEPA imposes procedural requirements designed to

14  force agencies to take a "hard look" at environmental consequences, but does not

15  mandate any substantive outcome.  Lands Council, 395 F.3d at 1026.  This "hard

16  look" requires a "full and fair discussion of significant environmental impacts" in

17  the EIS.  40 C.F.R. § 1502.1.  "An agency must also 'acknowledge and respond to

18  comments by outside parties that raise significant scientific uncertainties and

19  reasonably support that such uncertainties exist.'" Cal. ex rel. Imperial County Air

20  Pollution Control Dist. v. U.S. Dept. of Interior, --- F.3d ----, 2014 WL 2038234, at

21  *3 (9th Cir. May 19, 2014) (quoting The Lands Council v. McNair, 537 F.3d 981,

22  1001 (9th Cir. 2008) (en banc)).  Thus, in assessing challenges brought under

23  NEPA, once a court is "satisfied that a proposing agency has taken a 'hard look' at a

24  decision's environmental consequences, the review is at an end."  Or. Natural Res.

25  Council v. Lowe, 109 F.3d 521, 526 (9th Cir. 1997) (quoting Idaho Conservation

26  League v. Mumma, 956 F.2d 1508, 1519 (9th Cir. 1992) (citations omitted)).

27

28

# DISCUSSION

## I. Plaintiffs' Standing to Bring this Action

As an initial matter, the court considers Defendants' argument that Plaintiffs lack standing to bring this action. Constitutional standing requires a plaintiff to demonstrate:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 180–81 (2000); Cal. ex rel. Imperial County Air Pollution Control Dist. v. U.S. Dept. of Interior, --- F.3d ----, 2014 WL 2038234, at *3 (9th Cir. May 19, 2014). In addition, a plaintiff bringing suit under the APA for a violation of NEPA must show that the alleged injury falls within NEPA's "zone of interest." Western Watersheds Project v. Kraayenbrink, 632 F.3d 472, 485 (9th Cir. 2011)(citing Kootenai Tribe of Idaho, 313 F.3d at 1111-12).

Here, Plaintiffs bring a procedural claim under NEPA. To satisfy the injury in fact requirement, and thereby meet the first prong of Article III standing, "a plaintiff asserting a procedural injury must show that the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." Kraayenbrink, 632 F.3d at 485 (citations and internal quotation marks omitted). Furthermore, Plaintiffs "need [to] establish 'the reasonable probability of the challenged action's threat to [his or her] concrete interest.'" Hall v. Norton, 266 F.3d 969, 977 (9th Cir. 2001) (quoting Churchill County v. Babbitt, 150 F.3d 1072, 1078 (9th Cir. 1998)).

In NEPA cases, the concrete interest test requires a geographic nexus between the individual asserting the claim and the location suffering an environmental impact. Public Citizen v. Dep't of Transp., 316 F.3d 1002, 1015 (9th Cir. 2003) *reversed on other grounds* 541 U.S. 752 (2004); Cantrell v. City of Long Beach,

241 F.3d 674, 679 (9th Cir. 2001).  Specifically, Plaintiffs must allege that they will suffer harm by virtue of their geographic proximity to and use of areas that will be affected by BLM's policy.  Id.  Here, Plaintiffs have properly alleged, supported by several affidavits regarding various portions of land covered by the Solar PEIS, that their members use and enjoy areas located in the SEZs to observe nature and wildlife, among other things.  The members assert that the BLM's policy regarding utility-scale solar panels in the SEZs will negatively impact their use and enjoyment of these areas.  The Supreme Court has held that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."  Laidlaw, 528 U.S. at 182 (quoting Sierra Club v. Morton, 405 U.S. 727, 735 (1972)); Citizens for Better Forestry, 341 F.3d at 971.

The BLM argues Plaintiffs' declarations provide nothing more than "speculative fears that, at some future point, an as-yet-unidentified project may be constructed somewhere within the broad compass of the SEZs and variance areas and that such a project's as-yet-undefined features may affect Plaintiffs' enjoyment of the land within the as-yet-unknown project area."  (Def. MSJ at 17).  However, Plaintiffs are not required to assert that any specific injury will occur on any specific portion of the land that their members visit.  Citizens for Better Forestry, 341 F.3d at 971.  In the case of an alleged NEPA violation, the "asserted injury is that environmental consequences might be overlooked as a result of deficiencies in the government's analysis under environmental statutes."  Id. (internal quotations and citations omitted).

Once a plaintiff has established an injury in fact under NEPA, the causation and redressability requirements are relaxed.  Kraayenbrink, 632 F.3d at 485; Cantrell v. City of Long Beach, 241 F.3d 674, 682 (9th Cir.2001).  "[T]he members must show only that they have a procedural right that, if exercised, could protect

their concrete interests. . . ." <u>Defenders of Wildlife v. EPA</u>, 420 F.3d 946, 957 (9th Cir.2005) *rev'd on other grounds sub nom.* <u>Nat'l Ass'n of Home Builders v. Defenders of Wildlife</u>, 551 U.S. 644 (2007).  Because it is enough that a revised PEIS may redress Plaintiffs' alleged injuries, Plaintiffs have satisfied the causation and redressability requirements.  <u>Kraayenbrink</u>, 632 F.3d at 485; <u>Kootenai Tribe of Idaho</u>, 313 F.3d at 1113.

Plaintiffs also meet the requirements for associational standing: the interests at stake are pertinent to the interests of Plaintiffs, and there is no indication that resolving this case would require, or even be aided by, the participation of the organizations' individual members.  <u>Kraayenbrink</u>, 632 F.3d at 485; <u>Friends of the Earth</u>, 528 U.S. at 180–81.

Finally, Plaintiffs' NEPA claim falls within the statute's zone of interest.  <u>Kraayenbrink</u>, 632 F.3d at 485; <u>Kootenai Tribe of Idaho</u>, 313 F.3d at 1113–14.  Plaintiffs are non-profit conservation groups with the goal of protecting public lands and desert habitats in the southwestern states from development.  These organizations have  thousands of members who enjoy recreational, academic, and aesthetic pursuits on lands covered by the Solar PEIS.  As a result, they have a direct interest in verifying that the BLM adequately considers the environmental consequences of its utility scale solar panel program as required by NEPA and that the well being of the affected land is not threatened.  <u>See</u> <u>Kraayenbrink</u>, 632 F.3d at 485; <u>Cantrell</u>, 241 F.3d at 679.  Having found Plaintiffs meet the necessary requirements, the court concludes Plaintiffs have Article III standing.

**II.  Consideration of Reasonable Alternatives Under NEPA**

Plaintiffs argue that the BLM failed to meet their duty under NEPA to consider reasonable alternatives to utility-scale solar energy development on undeveloped public lands.  However, Defendants argue that the Solar PEIS, as adopted in the ROD, complies with NEPA and considered a reasonable range of alternatives.

1

## A.  NEPA

2       NEPA requires that an environmental impact statement ("EIS") be prepared

3 for all "major Federal actions significantly affecting the quality of the human

4 environment ."  42 U.S.C. § 4332(2)(C).  The EIS should "provide full and fair

5 discussion of significant environmental impacts and ... inform decisionmakers and

6 the public of the reasonable alternatives which would avoid or minimize adverse

7 impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1.

8 The EIS's scope and purpose define the reasonable range of alternatives that must

9 by analyzed by the agency.  Western Watersheds Project v. Abbey, 719 F.3d 1035,

10 1046 (9th Cir. 2013); Westlands Water Dist. v. U.S. Dep't of Interior, 376 F.3d 853,

11 868 (9th Cir. 2004).  An EIS must "[r]igorously explore and objectively evaluate all

12 reasonable alternatives, and for alternatives which were eliminated from detailed

13 study, briefly discuss the reasons for their having been eliminated."  40 C.F.R.

14 § 1502.14(a).

15       In this instance, the BLM adopted a "tiered" approach for complying with

16 NEPA, preparing the programmatic EIS at issue here to be followed later by

17 site-specific EISs for proposed solar projects.  "Tiering refers to the coverage of

18 general matters in broader environmental impact statements (such as national

19 program or policy statements) with subsequent narrower statements or

20 environmental analyses (such as regional or basinwide program statements or

21 ultimately site-specific statements) incorporating by reference the general

22 discussions and concentrating solely on the issues specific to the statement

23 subsequently prepared."  40 C.F.R. § 1508.28.  NEPA regulations encourage

24 agencies to "tier" their environmental impact statements in some situations because

25 tiering often enables agencies "to eliminate repetitive discussions of the same issues

26 and to focus on the actual issues ripe for decision at each level of environmental

27 review."  See 40 C.F.R. § 1502.20.

28

1   Where an agency is moving from "a program, plan, or policy environmental

2   impact statement to . . . a site-specific statement or analysis," 40 C.F.R.  §

3   1508.28(a), tiering is appropriate.  See 'Ilio'ulaokalani Coalition v. Rumsfeld, 464

4   F.3d 1083, 1094 (9th Cir. 2006).  A programmatic environmental impact statement

5   ("PEIS"), like the Solar PEIS in this case, is a broader and more programmatic

6   version of a project-specific EIS.  Generally, NEPA's requirements for an EIS apply

7   to a PEIS as well.  Id. at 1095-96.  "The detail that NEPA requires in an EIS

8   depends upon the nature and scope of the proposed action. The standards normally

9   applied to assess an EIS require further refinement when a largely programmatic

10  EIS is reviewed.  The critical inquiry in considering the adequacy of an EIS

11  prepared for a large scale, multi-step project is not whether the project's

12  site-specific impact should be evaluated in detail, but when such detailed evaluation

13  should occur."  California v. Block, 690 F.2d 753, 761 (9th Cir. 1982).

14  The court may not substitute its judgment for that of the agency, however.

15  See Protect Our Cmtys. Found., 2013 WL 5947137, at *2 (citing Selkirk

16  Conservation Alliance v. Forsgren, 336 F.3d 944, 958 (9th Cir. 2003)).  Judicial

17  review of an agency's EIS under NEPA is limited to a "rule of reason that asks

18  whether an EIS contains a reasonably thorough discussion of the significant aspects

19  of the probable environmental consequences."  City of Sausalito v. O'Neill, 386

20  F.3d 1186, 1206-07 (9th Cir. 2004)(quoting Idaho Conservation League v. Mumma,

21  956 F.2d 1508, 1519 (9th Cir. 1992)).  Pursuant to the "rule of reason," an agency

22  need not consider alternatives that are infeasible, ineffective, or inconsistent with

23  their basic policy objectives.  Resources Ltd., Inc. v. Robertson, 8 F.3d 1300, 1307

24  (9th Cir. 1993); Life of the Land v. Brinegar, 485 F.2d 460, 472 (9th Cir.

25  1973)(holding an EIS need not consider an alternative that does not respond to the

26  purpose and need, or the implementation of which is deemed remote and

27  speculative).  Ultimately, the "touchstone for [a court's] inquiry is whether an EIS's

28

1 selection and discussion of alternatives fosters informed decision-making and

2 informed public participation." Id.

3    **B. Consideration of Reasonable Alternatives**

4    Plaintiffs contend the BLM's refusal to consider the alternatives of

5 distributed generation and utility-scale development limited to previously disturbed

6 public lands renders the Solar PEIS inadequate.  Plaintiffs argue that the BLM

7 unreasonably limited its analysis in the Solar PEIS to "one particular scale of solar

8 energy generation (utility-scale) on a single type of landscape (undeveloped public

9 lands) in establishing its program to help increase the nation's renewable energy

10 supply" by "misrepresent[ing] the broad policies and goals assigned by the

11 President, Congress and the Interior Secretary."  (Pls. MSJ at 19).

12    The appropriate range of alternatives to be considered by the agency is

13 defined by the purpose and need statement of the EIS. 40 C.F.R. § 1502.13; Carmel,

14 123 F.3d at 1155.  An EIS need not consider an alternative that does not respond to

15 the purpose and need, or the implementation of which "is deemed remote and

16 speculative."  Life of the Land v. Brinegar, 485 F.2d 460, 472 (9th Cir. 1973).

17    As noted above, the purpose and need provision of the Solar PEIS indicates

18 that the BLM's proposed comprehensive Solar Energy Program was designed to be

19 consistent with the mandates and requirements of three documents: (1) Executive

20 Order ("E.O.") 13212; (2) the Energy Policy Act of 2005; and (3) Department of the

21 Interior ("DOI") Secretarial Order 3285SA1.  Executive Order 13212 mandates that

22 agencies expedite their review of permits for energy-related projects, or take other

23 actions as necessary to accelerate the completion of such projects, in a manner

24 consistent with applicable laws to increase the "production and transmission of

25 energy in a safe and environmentally sound manner."  66 Fed. Reg. 28357 (May 18,

26 2001).  The Energy Policy Act of 2005 sets forth the "sense of Congress" that the

27 DOI should seek to have approved non-hydropower renewable energy projects on

28 the public lands with a generation capacity of at least 10,000 MW by 2015.  Pub. L.

109–58, § 211, 119 Stat. 594, 660 (2005).  In DOI Secretarial Order 3285A1, the Secretary of the Interior "establishe[d] the development of renewable energy as a priority" for the DOI and created a Task Force on Energy and Climate Change. (DOI Secretarial Order 3285A1, AR 4479:0242431).  Among other things, the Task Force was charged with "identifying and prioritizing the specific locations in the United States best suited for large-scale production of solar . . . energy (e.g., renewable energy zones)" and "establish[ing] clear policy direction for authorizing the development of solar energy on public lands."  (Id.)

Plaintiffs contend these three "driving" documents speak broadly of the need to develop additional renewable energy resources, but should not have been construed as limiting the BLM's consideration to utility-scale solar energy development on undisturbed public lands.  Because of the BLM's alleged misrepresentation of the driving policies behind the Solar PEIS, Plaintiffs contend the BLM failed to consider reasonable alternatives to utility-scale solar energy development on public lands, particularly the distributed generation alternative and the disturbed lands alternative.  Each of Plaintiffs' proposed alternatives will be addressed in turn.

### 1. Distributed Generation Alternative

Distributed generation "refers to the installation of small-scale solar energy facilities at individual locations at or near the point of consumption (e.g., use of solar PV panels on a business or home to generate electricity for on-site consumption)."  (Final PEIS Vol. 1, AR 27:0014350).  Plaintiff argues distributed generation is a reasonable alternative for solar energy development that the BLM should have considered in the Solar PEIS.

As explained in the Solar PEIS, the BLM limited its analysis to utility-scale solar development because "[a]lternatives incorporating distributed generation with utility-scale generation, or looking exclusively at distributed generation, do not respond to the agencies' purpose and need for agency action in this PEIS."  (Id. at

0014350).  The BLM indicated this was, "in part, because the Energy Policy Act of 2005 and DOI Secretarial Order 3285A1 require that the BLM take steps to facilitate development at that scale."  (Id. at 0014251).

> The applicable federal orders and mandates providing the drivers for specific actions being evaluated in this PEIS compel the agencies to evaluate utility-scale solar energy development. As discussed in Section 1.1, the Energy Policy Act of 2005 requires the Secretary of the Interior to seek to approve non-hydropower renewable energy projects on public lands with a generation capacity of at least 10,000 MW of electricity by 2015; this level of renewable energy generation cannot be achieved through distributed generation systems. In addition, Order 3285A1 issued by the Secretary of the Interior requires the BLM and other Interior agencies to undertake multiple actions to facilitate large-scale solar energy production.

(Id. at 0014350).  Accordingly, the BLM's purpose and need for agency action in the Solar PEIS "focused on the siting and management of utility-scale solar energy development on public lands."  (Id.)  The BLM further noted that "it has no authority or influence over the installation of distributed generation systems, other than on its own facilities, which the agency is evaluating at individual sites through other initiatives."  (Id.)

The Solar PEIS also described the inherent challenges associated with distributed generation.

> Because these systems typically do not include electricity storage, they cannot provide power during the evenings or at night, and the power output can fluctuate significantly during cloudy weather. As a result, buildings equipped with roof-top PV systems remain dependent on the transmission grid, and electric utilities must maintain adequate generating capacity to provide electricity to these customers when needed.

(Id.)  While one study of available roof space concluded that up to 23% of required electricity supplies could be met with roof-top PV systems, the BLM noted that the study also found that "integrating PV into the electric grid at levels that high could be challenging."  (Id. at 0014251).  "For a variety of reasons, (e.g., upper limits on interconnecting and integrating distributed generation into the electric grid, cost, technical challenges related to voltage control and system protection with high-penetration PV, and continued dependency of buildings on grid supplied

power),” the BLM determined that distributed solar energy generation alone cannot meet the goals for renewable energy development addressed by the Solar PEIS. (Id. at 0014350).  “Ultimately, both utility-scale and distributed generation solar power will need to be deployed at increased levels, and the highest penetration of solar power overall will require a combination of both types.”  (Id. at 0014251).  The Solar PEIS acknowledged that the evaluation of distributed generation systems falls within the scope of DOE’s mission; however, the DOE was already addressing distributed generation in other initiatives separate from the Solar PEIS.  (Id. at 0014351).  Thus, the Solar PEIS focused solely on utility-scale solar development to the exclusion of distributed generation.

However, Plaintiffs argue that the BLM’s explanation for dismissing a distributed generation alternative from further evaluation does not stand up to scrutiny.  (Pls. MSJ at 21).  First, Plaintiffs contend the Energy Policy Act of 2005 and Secretarial Order 3285A1 did not actually require the BLM to facilitate solar energy development, given that the DOI was chiefly responding to the Energy Policy Act of 2005 and it was already well on its way to meeting the goal of 10,000 MW of non-hydropower renewable energy on public lands by 2015.  (Pls. MSJ at 21; EPA Comment May 2, 2011, AR 3013:0067150, 0067157 (noting that almost 5,500 MW of new energy generation had already been approved and applications for priority projects totaling more than 4,500 MW were set to be approved by the end of 2011)).

Plaintiffs also contend the EPA refuted the BLM’s assertion that a distributed generation alternative did not merit further consideration because distributed generation by itself could not achieve the 10,000 MW goal of the Energy Policy Act of 2005. (Final PEIS Vol. 1, AR 27:0014250-51).  In its comment on the draft PEIS, the EPA noted that a California commission had previously determined that distributed generation in that state alone had the potential to generate 27,500 MW of energy.  (EPA Comment May 2, 2011, AR 3013:0067157).

As an initial matter, the court rejects Plaintiffs' suggestion that the BLM simply "responded to the suggestions for additional alternatives by stating that the alternatives were not reasonable and eliminating them from further consideration." (Pls. MSJ at 21). This statement implies the BLM summarily disregarded distributed generation as an alternative without providing any justification for its decision in that regard. In actuality, the Solar PEIS contains an entire subsection entitled "Distributed Generation" that discusses the BLM's rationale for excluding distributed generation from the Solar PEIS and limiting the scope of the Solar PEIS to utility-scale solar projects. (ROD, AR 35:0014349-51).

Similarly lacking merit is Plaintiffs' argument that the BLM misrepresented the driving policies behind the Solar PEIS when it determined that utility-scale solar projects would best serve the Purpose and Need for the Solar PEIS. While the goal of the Energy Policy Act of 2005 may already have been met, Defendants correctly point out that the goal is to achieve at least 10,000 MW of non-hydropower renewable energy on public lands by 2015. Simply satisfying the 10,000 MW minimum requirement of the Act does not achieve the overriding goal of the Energy Policy Act of 2005 to encourage the growing production of renewable energy on public lands. Thus, the BLM's consideration of both the goals and purposes of the Act in the Solar PEIS was both informed and reasonable and should not have been cabined by the threshold 10,000 MW minimum.

Moreover, Secretarial Order 3285A1 directs the DOI to "establish clear policy direction for authorizing the development of solar energy on public lands." (DOI Secretarial Order 3285A1, AR 4479:0242432). Indeed, it specifically tasks the DOI with identifying and prioritizing the specific locations in the United States "best suited for large-scale production" of solar energy in

1  renewable energy zones, much like the SEZs identified in the Solar PEIS.[6]  (Id.
2  (emphasis added)).  This language undercuts Plaintiffs' contention that there was
3  nothing in the driving policies behind the Solar PEIS "requir[ing] the BLM and
4  other DOI agencies to undertake multiple actions to facilitate large-scale solar
5  energy production."[7]  (See Final PEIS Vol. 7, AR 34:0017514).

6        Additionally, the BLM's determination that distributed generation is not
7  feasible from a technical and commercial perspective also merits deference, as the
8  agency's conclusion is based on its expertise and consideration of the available
9  evidence.  See, e.g., Lands Council v. McNair, 537 F.3d 981, 1003 (9th Cir. 2008)
10 (en banc) (observing that an agency must explain the methodology it used for its
11 analysis, but NEPA does not require the court to decide whether the EIS is based on
12 the best scientific methodology available); Protect our Communities Foundation v.
13 Jewell, 2014 WL 1364453, at *7 (S.D. Cal. Mar. 25, 2014).  As clearly set forth in
14 the Solar PEIS, the BLM assessed the inherent challenges associated with
15 distributed generation and concluded utility-scale development was required to meet
16 the purpose and need of the Solar PEIS.  The agency also relied on its expertise in
17 finding that "upper limits on interconnecting and integrating distributed generation
18 into the electric grid, cost, technical challenges related to voltage control and system
19 protection with high-penetration PV, and continued dependency of buildings on
20 grid supplied power" all weighed against distributed generation being a viable

21
22
_____

23        [6] Plaintiffs point out that the identification and prioritization of locations
   best-suited for large-scale renewable energy production was just one of eight elements
24 in an overall strategy to increase the development and transmission of renewable
   energy.  (Pls. Reply at 9 n. 6).  However, the fact that this particular instruction was
25 listed among others does not diminish the BLM's obligation to comply with its
   directive.
26

27        [7] Plaintiffs' seeming challenge as to whether the Secretary of the Interior's
   correctly interpreted the Energy Policy Act of 2005 in Secretarial Order 3285A1 is not
28 before the court.  Rather, the issue is whether the BLM, as an agency of the DOI,
   reasonably relied upon the Secretarial Order when undertaking the Solar PEIS.  For the
   reasons set forth above, the court concludes that it did.

1    alternative for consideration in the Solar PEIS.  (Final PEIS Vol. 1, AR

2    27:0014350).

3         While an EIS must "[r]igorously explore and objectively evaluate all

4    reasonable alternatives," NEPA only requires an EIS to "briefly discuss the reasons"

5    for alternatives which were eliminated from detailed study. 40 C.F.R. § 1502.14(a).

6    Here, the BLM considered the possibility of distributed generation and sufficiently

7    explained its rationale for eliminating it as a reasonable alternative.  See Protect our

8    Communities Foundation, 2014 WL 1364453, at *7 (finding the BLM's conclusion

9    that distributed generation was not a feasible alternative to a utility-scale solar

10   development project was not arbitrary or capricious).  Defendants correctly note that

11   the BLM provided more than sufficient discussion and analysis of the distributed

12   generation alternative to satisfy NEPA.  Although the BLM must consider project

13   alternatives that would avoid or minimize damage to the environment, the agency is

14   not required to provide a comprehensive examination of alternatives that lack

15   feasibility or adequacy to meet its stated objectives.  See Life of the Land, 485 F.2d

16   at 472.  Accordingly, the BLM's consideration of distributed generation in the Solar

17   PEIS was neither arbitrary, capricious, nor contrary to law, and, therefore, complied

18   with NEPA.  See 5 U.S.C. § 706(2)(A).

19              2.  Disturbed Lands Alternative

20        Plaintiffs further contend the BLM failed to consider the possibility of

21   limiting utility-scale solar energy development to previously disturbed lands.

22        In the Solar PEIS, the BLM indicated that, while not an independent

23   alternative, "consideration was given to previously disturbed lands in identifying

24   areas best suited to solar energy development." (Final PEIS Vol. 1, AR

25   27:0014353).  The BLM noted "there is no clear and well-established definition of

26   what constitutes 'previously disturbed public lands,' nor are there any clearly

27   defined thresholds for determining when lands cannot be restored to their  former,

28   undeveloped state. (Final PEIS Vol. 1& 7, AR 27:0014353; 34:0017638).  And yet,

the BLM acknowledged "the potential value of development on such lands." (Final PEIS Vol. 7, AR 34:0017638). Accordingly, the BLM "identified some lands within SEZs as particularly well suited for solar development because previous human or natural disturbance had occurred on those lands." (Final PEIS Vol. 1, AR 27:0014353). Moreover, the Solar PEIS encourages solar development on suitable nonfederal lands for "projects located jointly on SEZ lands and suitable adjacent private, state, tribal, or DoD withdrawn lands (e.g., lands with low resource conflict or degraded, disturbed, or previously disturbed areas)." (Final PEIS Vol. 1, AR 27:0014317). For these projects, the BLM extended the DOI's permitting incentives provided for SEZs to the disturbed lands adjacent to the SEZs. (Id.)

As part of the proposed programmatic design features in the Solar PEIS, the BLM created mitigation requirements that have been incorporated into the proposed action or alternatives to avoid and/or minimize potential adverse impacts from solar development. (Final PEIS Vol. 6, AR 32:0016626). The proposed design features require solar facilities to be sited, designed, and constructed to minimize impacts on ecological and cultural resources. (Id. at 0016647, 0016689). The Solar PEIS provides several potential methods to minimize the impact on these resources by using disturbed lands, including:

- Considering siting projects on previously disturbed lands in close proximity to energy load centers to avoid and minimize impacts on remote, undisturbed lands.

- Designing project facilities to reduce the number of stream crossings within a particular stream or watershed (e.g., access roads and utilities could share common ROWs, where feasible), and locating facilities in pre-disturbed areas to reduce potential for habitat fragmentation.

- Encouraging the use of previously disturbed lands and lands determined by archeological inventories to be devoid of historic properties.

(Id. at 0016655, 0016689).

Additionally, the proposed SEZ Identification Protocol in the Solar PEIS highlights the consideration of degraded, disturbed, and/or previously disturbed

1   lands as part of all future processes to identify new or expanded SEZs. (Final PEIS

2   Vol. 1, AR 27:0014353).  "In identifying potentially suitable lands for SEZs, BLM

3   state and field offices will seek opportunities to locate new or expanded SEZs in

4   degraded, disturbed or previously disturbed areas." (Final PEIS Vol. 6, AR

5   32:0016748).  Moreover, "the BLM will take into account opportunities to partner

6   with adjacent federal and nonfederal landowners (e.g., private, state, tribal, or

7   DoD-withdrawn lands).  For example, small SEZs may be appropriate on

8   BLM-administered lands when they are located adjacent to degraded, disturbed, or

9   previously disturbed private lands.  This combination of BLM-administered and

10  nonfederal lands could allow for a combined use area, allowing for the expansion of

11  renewable energy development onto well-suited adjacent lands." (Id. at 0016748-

12  49).

13       The BLM also found that the Preferred Alternative's inclusion of a variance

14  process outside of the SEZs created additional opportunities to site solar energy

15  projects on lands that are, or are near to, degraded, disturbed, or previously

16  disturbed sites. (Final PEIS Vol. 1, AR 27:0014478).  To support this effort, the

17  proposed variance process provides for favorable consideration of ROW

18  applications on disturbed lands.  (Id. at 0014353).

19       Plaintiffs nevertheless argue the BLM improperly refused their repeated

20  requests to broaden the Solar PEIS to consider utility-scale solar development on

21  previously disturbed lands. (Pls. MSJ at 21).  Plaintiffs challenge Defendants'

22  rationale for not analyzing an alternative that would focus utility-scale solar

23  development on degraded lands because those lands were not likely to coincide with

24  the public lands managed by the BLM.  (Final PEIS Vol. 1, AR 27:0014353).

25  Plaintiffs contend this rationale does not survive scrutiny given that the

26  Environmental Protection Agency ("EPA") provided the BLM with a list of

27  contaminated sites on or near BLM-managed lands that might be suitable for utility-

28

1   scale solar energy development.  (See Final PEIS, AR 27:0014353; EPA Comment

2   Aug. 27, 2012, AR 3362:0168277-78).

3        Plaintiffs emphasize that the EPA also noted in its comments that using

4   degraded lands for solar energy better fit the call of Secretarial Order 3285A1 for

5   responsible renewable energy development while protecting and enhancing the

6   nation's natural resources. (EPA Comment May 2, 2011, AR 3013:0067154). While

7   the Solar PEIS acknowledges that BLM will prioritize the use of disturbed public

8   lands for solar development in the future, Plaintiffs contend there is nothing in the

9   record that suggests that identifying these lands now would significantly change the

10  20-year time frame for designing, permitting and constructing utility-scale solar

11  projects.  (Pls. Reply at 7 n. 4 (citing Final PEIS Vol. 6, AR 32:0016748)).

12  Plaintiffs argue Defendants indirectly acknowledge a disturbed lands alternative is

13  feasible in the Solar PEIS by stating that BLM will seek "to locate new or expanded

14  SEZs in degraded, disturbed or previously disturbed areas." (Final PEIS Vol. 6, AR

15  32:0016748).  The Solar PEIS also expresses the BLM's willingness to partner with

16  nonfederal landowners to designate small SEZs when they are "located adjacent to

17  degraded, disturbed, or previously disturbed lands."  (Id.)  Plaintiffs note the Solar

18  PEIS did not provide an explanation as to why the BLM is willing and able to make

19  this effort going forward but could not when it prepared the PEIS.  (Pls. Reply at 8).

20       Here again, Plaintiffs' general assertion that the BLM failed to consider the

21  use of disturbed lands is clearly belied by the Solar PEIS itself.  While the

22  possibility of limiting development to disturbed lands was not incorporated into the

23  Solar PEIS as an independent alternative, strong consideration was given to the use

24  of disturbed lands for solar development throughout the Solar PEIS: the Solar PEIS

25  considered the use of disturbed lands when (1) identifying SEZs initially; (2)

26  proposing future methods of identifying SEZs; and (3) creating a variance process

27  that would provide for favorable consideration of ROW applications on disturbed

28  lands.  For projects located on SEZ lands adjacent to suitable non-public disturbed

1    lands, the Solar PEIS allows the BLM to extend the proposed permitting incentives

2    for projects on SEZs to the adjacent non-public lands as well.

3        Despite these considerations, Plaintiffs object to the BLM's failure to

4    consider limiting solar development to disturbed lands as an independent alternative

5    in the Solar PEIS.  In making this decision, the BLM noted the lack of a clear and

6    well-established definition of what constitutes "previously disturbed public lands"

7    and any clearly defined thresholds for determining when lands cannot be restored to

8    their former, undeveloped state.  (Final PEIS Vol. 1, AR 27:0014353).  Similarly,

9    the BLM expressed concern that the lands identified as disturbed by the EPA were

10   not likely to coincide substantially with BLM-administered public lands.  (Id.)

11   While Plaintiffs suggest this concern was unfounded once the EPA provided the

12   BLM with a list of disturbed sites in the proposed SEZs, Defendants point out that

13   the list of disturbed sites does not indicate whether all such areas have adequate

14   transmission capacity nearby, adequate infrastructure, or appropriate zoning, and

15   whether additional work will need to be performed, both on a regional and local

16   level, before suitable sites may actually be inventoried.  (Defs. MSJ at 17 (citing

17   EPA Comment May 2, 2011, AR 3013:0067153-55 (observing that some disturbed

18   sites may provide additional benefit by having infrastructure already in place and

19   suggesting by negative implication that some areas may not))).

20       Plaintiffs suggest that the identification of disturbed lands must be

21   undertaken within the Solar PEIS, but Defendants argue the purpose of the Solar

22   PEIS and ROD was to identify what areas of the BLM-administered lands should be

23   excluded from utility-scale development and what areas might be well suited for

24   such projects.  (Defs. Reply at 6-7).  Here, nothing in the Solar PEIS or ROD

25   precludes siting future projects on disturbed lands where suitable parcels can be

26   identified and, if needed, acquired.  Rather, it is the expectation of the BLM and the

27   EPA that the Solar PEIS and ROD will, in fact, encourage siting proposed solar

28   projects on previously disturbed lands. (Defs. Mot. at 22 (citing Final PEIS Vol. 6,

AR 32:0016748-49; Final PEIS Vol 7., AR 34:0017515; EPA Comment Aug. 27, 2012, AR 3362:0168275, 0168277-78)).

At this juncture, it is significant to note that the challenged document is a programmatic EIS rather than a project-specific EIS.  At the programmatic stage, an agency develops alternative management scenarios responsive to public concerns, analyzes the costs, benefits and consequences of each alternative in an environmental impact statement ('EIS'), and adopts an amendable overall plan to guide management of resource development.  'Ilio'ulaokalani Coalition v. Rumsfeld, 464 F.3d 1083, 1094 (9th Cir. 2006); Ecology Ctr., Inc. v. U.S. Forest Serv., 192 F.3d 922, 923 n. 2 (9th Cir.1999).  Following the programmatic stage is the implementation stage during which individual site-specific projects, consistent with the overall plan, are proposed and assessed.  Id.  A programmatic EIS must provide "sufficient detail to foster informed decision-making," but an agency need not fully evaluate site-specific impacts "until a critical decision has been made to act on site development."  Id. (citations and internal quotations omitted).  Notably, the "critical inquiry in considering the adequacy of an EIS prepared for a large scale, multi-step project is not whether the project's site-specific impact should be evaluated in detail, but when such detailed evaluation should occur."  Block, 690 F.2d at 761.

Here, all solar energy projects proposed under the Solar PEIS will undergo site-specific environmental review once solar developers submit ROW applications for individual projects.  See 40 C.F.R. § 1502.20; see also 'Ilio'ulaokalani, 464 F.3d at 1094 (discussing tiered structure between programmatic EIS and site-specific EIS).  The Solar PEIS does not remove the BLM's critical obligation to consider the site-specific environmental impacts of using undisturbed land as opposed to a parcel of disturbed land.  In fact, the BLM's encouragement of disturbed land use throughout the Solar PEIS indicates it will be a factor for further consideration at the site-specific level.  By consistently encouraging the use of disturbed lands

within SEZs, variance areas, and adjacent non-public lands throughout the Solar PEIS, the BLM has established a programmatic preference for disturbed land use that allows for further consideration at the EIS level for site-specific proposals.  If a developer proposes utility-scale solar development of 100 acres of undisturbed lands when there are 100 acres of disturbed lands equally suitable, the Solar PEIS allows the BLM to factor the availability of suitable disturbed lands into consideration and find that the use of disturbed land would more greatly mitigate the impact on ecological and cultural resources than the use of undisturbed land on a project-by-project basis.

In sum, the BLM discussed its reasons for eliminating the sole use of disturbed lands as an alternative in the Solar PEIS, and then proceeded further to find that the use of disturbed lands may mitigate the impacts of solar development on ecological and cultural resources and encourage the use of disturbed land throughout the Solar PEIS.  As a whole, the court finds the BLM's consideration of disturbed land use in the Solar PEIS informed decision-making and informed public participation, such that it was neither arbitrary, capricious, nor contrary to law.  See 5 U.S.C. § 706(2)(A).  As a result, the court concludes the BLM's consideration of disturbed land use in the Solar PEIS satisfies its obligations under NEPA.

### C. Duty to Consider Broader Range of Alternatives for Broader Problem

Lastly, Plaintiffs argue the Solar PEIS was created to address a broad problem and therefore the BLM was required to consider a broader range of alternatives than it considered.  Because "the proposal here to expedite utility-scale solar energy development on undisturbed lands is but part of a larger plan to deal with the problem of increasing the supply and availability of energy for our Nation," Plaintiffs contend the range of alternatives that must be evaluated is broadened.  (Id.)  Plaintiffs rely on the Ninth Circuit's decision in 'Ilio'ulaokalani finding the range of alternatives that must be evaluated is broadened whenever a proposed action is part of a plan to address a broad problem.  (Pls. Reply at 9 (citing

'Ilio'ulaokalani, 464 F.3d at 1098)).  Plaintiffs suggest that here, as in 'Ilio'ulaokalani, the PEIS cites a broad purpose that is not tied to a specific parcel of land or a particular technology or scale of solar energy generation.  (Id.)  Therefore, the BLM here was obligated to analyze distributed generation of solar energy and utility-scale energy production on disturbed lands as reasonable alternatives to the proposed action.

In 'Ilio'ulaokalani, the Army stated its mission as follows: "to enable the Army to achieve the force characteristics articulated in the Army Vision in the most timely and efficient manner possible and without compromising readiness and responsiveness.... Transformation is needed to address the changing circumstances of the 21st Century."  464 F.3d at 1098 (quoting Army Final PEIS at 1-2, AR 0003865).  The PEIS "then leaps to the assumption that transformation in Hawaii or no action are the only alternatives," even though the Army's purpose was "not, by its own terms, tied to a specific parcel of land."  Id.  The Ninth Circuit found this constituted an impermissible narrowing of alternatives under NEPA.

> Our sister circuit has held that "[w]hen the proposed action [here the transformation of the 2nd Brigade] is an integral part of a coordinated plan to deal with a broad problem, the range of alternatives that must be evaluated is broadened." City of Alexandria v. Slater, 198 F.3d 862, 868 (D.C. Cir. 1999) (quoting Natural Res. Defense Council v. Morton, 458 F.2d 827, 835 (D.C. Cir. 1972)) (quotation marks omitted).  Between the purpose articulated in the PEIS and that articulated in the SEIS, the Army made the decision to require transformation of the 2nd Brigade in Hawaii. This decision was never explained or justified and foreclosed alternatives that could have been consistent with the Army's stated mission.

Id.

First and foremost, unlike the Army's PEIS in 'Ilio'ulaokalani, the BLM's Solar PEIS provided an explanation for its decision to exclude distributed generation and not to limit development to disturbed lands.  As previously discussed, while the BLM did not consider these options as independent alternatives, the Solar PEIS reveals the BLM gave serious consideration to whether they would address the purpose and need of the Solar PEIS and concluded that they would not.

Second, the court rejects Plaintiffs' contention that the BLM's purpose "did not demand a particular technology or scale of solar energy generation and did not require siting projects on a specific landscape type." (Pls. Reply at 9).  As noted above, Secretarial Order 3285A1 lists identifying and prioritizing locations best-suited for large-scale renewable energy production.  Thus, the BLM reasonably focused upon the development of utility-scale solar energy based upon its potential for maximum energy production rather than distributed generation.  Similarly, Secretarial Order 3285A1 instructed agencies to create resource zones,  such as the SEZs, on public lands as opposed to the urban areas that are generally suitable for distributed generation and outside of the BLM's control.  While limiting development to disturbed lands may have also been consistent with the purpose of the Solar PEIS, the Solar PEIS did not foreclose the possibility of using disturbed lands.  It simply opted not to limit solar development to disturbed lands when solar development of undisturbed lands might also be consistent with its purpose.  Additionally, while there is nothing in the Solar PEIS that precludes future development on disturbed lands, there is a great deal of discussion in the Solar PEIS about the BLM's encouragement of disturbed land use and the potential incentives available for projects using disturbed lands or public lands adjacent to disturbed lands.

In sum, the court finds the BLM properly considered the relevant factors and articulated a rational connection between the facts found and the choices made as required under NEPA.  Defendants gave the possibilities of distributed generation and limiting solar development to disturbed lands a "hard look" and reasonably concluded they were inadequate.  While the Solar PEIS may be "part of a larger plan to deal with the problem of increasing the supply and availability of energy for our Nation" as Plaintiffs suggest, it is also true that the Solar PEIS was crafted to reasonably address the more specific mandates of Executive Order 13212 and the Energy Policy Act of 2005, as well as the requirements of DOI Secretarial Order

3285A1.  In light of these considerations, the court finds the Solar PEIS contains a "full and fair discussion of significant environmental impacts" associated with solar development and accomplishing the goals of the Solar PEIS.  40 C.F.R. § 1502.1. In assessing Plaintiffs' challenge brought under  NEPA, the court is satisfied Defendants took a 'hard look' at the environmental consequences associated with the Solar PEIS, and, thus, the court's review is at an end.

## CONCLUSION

For the reasons discussed above, the court finds that Plaintiffs have standing to bring this action challenging the sufficiency of the Solar PEIS under NEPA. However, the court further finds the Solar PEIS complies with NEPA's requirement to consider reasonable alternatives.  In connection therewith, the court finds Defendants' actions were not arbitrary, capricious, an abuse of discretion or otherwise contrary to law.  Accordingly, Plaintiffs' motion for summary judgment is DENIED, and Defendants' cross-motion for summary judgment is GRANTED.  The Clerk of Court is instructed to enter judgment in favor of Defendants, and against Plaintiff, on all claims and to close the file.

IT IS SO ORDERED.

DATED:  June 25, 2014

_____
Hon. Jeffrey T. Miller
United States District Judge